UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CAROLYN SUE JACKSON,<br><br>     Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,[1]<br><br>     Defendant. | Case No. 3:14-cv-01996<br><br>Chief Judge Crenshaw<br>Magistrate Judge Newbern |

To the Honorable Waverly D. Crenshaw, Jr., Chief Judge:

## **REPORT AND RECOMMENDATION**

Pending before the Court in this Social Security appeal is Plaintiff Carolyn Sue Jackson's

Motion for Judgment on the Administrative Record (Doc. No. 14), to which the Commissioner of

Social Security has responded (Doc. No. 15). Jackson has filed a reply in support of her motion.

(Doc. No. 16.) Upon consideration of these filings and the transcript of the administrative record

(Doc. No. 12),[2] and for the reasons given below, the Magistrate Judge RECOMMENDS that

Jackson's motion for judgment be DENIED and that decision of the Commissioner be

AFFIRMED.

---

[1]     Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2]     Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Statement of the Case

Jackson filed an application for disability insurance benefits under Title II of the Social Security Act on July 5, 2011, alleging disability onset as of May 1, 2011 due to spinal injury, back pain, hepatitis C, depression, and anxiety. (Tr. 14, 153.) Tennessee Disability Determination Services (DDS) denied Jackson's claims upon initial review and again following her request for reconsideration. Jackson subsequently requested *de novo* review by an Administrative Law Judge (ALJ). The ALJ heard the case on May 16, 2013, when Jackson appeared with counsel and gave testimony. (Tr. 33–61.) A vocational expert also testified at the hearing. The ALJ took the matter under advisement until June 21, 2013, when she issued a written decision finding Jackson not disabled. (Tr. 14–22.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since May 11, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: a back disorder and hepatitis C (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit, stand, and walk each for 6 hours of an 8-hour day; frequently lift/carry 10 pounds; occasionally lift 20 pounds; and never be exposed to hazards found in the workplace. She would . . . also require a sit/stand option. She would be further limited to simple, repetitive work consisting of 1–2 step tasks and instructions. She should perform no work that requires reading or writing as part of the regular job duties. She would be better if shown how to do the task rather than told.

6. The claimant is capable of performing past relevant work as a garment sorter and a sales attendant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

2

7.      The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2011, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 16–18, 21.)

On August 18, 2014, the Appeals Council denied Jackson's request for review of the ALJ's decision (Tr. 1–3), rendering that decision final. This action was timely filed on October 17, 2014. 42 U.S.C. § 405(g).

## II.     Review of the Record

The ALJ summarized Jackson's hearing testimony as follows:

At the hearing, the claimant testified that she works 25 hours a week at Goodwill. Before May 2011, she worked full-time until her pain became unbearable. She lives with her adult son and a male friend. She is able to drive and take the bus. She attends church from time to time. She enjoys performing and spending time with her son. She stated that she is disabled due to illiteracy. She has cirrhosis of the liver from past drug use. She has not used drugs in 18 years. She receives mental health treatment from Victoria Cook. She testified that she is not taking liver medications. She takes hydrocodone for pain twice a day. She is supposed to see a chiropractor for her spine. She stated that she can sit for 5 hours to work, but her pain flares up when she goes home. She admitted she does not have difficulty standing to wash dishes. She testified that she could stand up to one hour. She cannot lift more than 10 pounds. She can walk 30 minutes. She testified that she can lift a gallon of milk and she can occasionally lift a case of water. Her pain medications make her drowsy. She has difficulty comprehending what she reads. She needs help grocery shopping. She can write a grocery list. Her imaginary friends came with her to the hearing. She stated that she sees them every day. They protect the claimant and tell her to lock her doors.

(Tr. 18–19.)

In her brief, Jackson gives the following summary of the radiographic evidence in the record:

An x-ray of the lumbar spine from May of 2009 revealed mild anterior endplate spurring inferiorly as well as facet arthropathy at L5-S1. Imaging studies of the bilateral feet from June of 2010 revealed hallux valgus deformity and small plantar calcaneal bone spurs. An x-ray of the left hip from June of 2010 showed mild left hip osteoarthritis. An x-ray of the cervical spine from June of 2010 revealed spondylosis with C5-6 degenerative disc disease and associated small osteophytes impinging upon the right and left intervertebral neural foramina.

3

(Doc. No. 14-1, PageID# 438 (citing Tr. 267, 277–80).)

On March 17, 2011, Jackson presented as a new patient to Dr. Suzette A. Kelly, M.D., complaining of back pain and pain and tingling in her fingers and toes. (Tr. 314.) Jackson also requested "a note from her doctor for her to be put on light duty at work[.]" (*Id.*) Dr. Kelly made note of Jackson's chronic conditions, including hepatitis C, tobacco use disorder, cervical spondylosis, and cirrhosis of the liver. (*Id.*) Jackson complained to Dr. Kelly of abdominal pain; paresthesia in her hands that was moderately severe; depression, fear of pain, and being stressed at work; moderately severe neck pain associated with stiffness; and back pain with moderate myalgia of the left leg associated with numbness. (*Id.*) Dr. Kelly noted that Jackson was anxious, crying, obese, depressed, and displayed poor hygiene. (Tr. 315.) Physical examination produced normal results, aside from a rash on Jackson's face which was thought to be rosacea. (*Id.*) It was noted that she was "walking around in room, as she [complains of] [left] leg numbness." (*Id.*) Dr. Kelly ordered lab work to investigate the cause of the pain and tingling in Jackson's extremities, noted that Jackson's chronic conditions were stable, and recommended that she use over-the-counter pain medications for her spinal pain. (*Id.*)

Based on this initial office visit and examination, Dr. Kelly completed a Medical Source Statement (MSS) of Ability To Do Work-Related Activities (Physical), dated March 17, 2011. (Tr. 285–90.) In the MSS, Dr. Kelly opined that Jackson's physical conditions and symptoms resulted in the following limitations: she could occasionally lift/carry up to 10 pounds, but could never lift or carry any weight above 10 pounds; could sit, stand, and walk in combination for a total of two hours and thirty minutes out of an eight-hour day; could use her hands occasionally for reaching, handling, and fingering, but never to push or pull; could occasionally operate foot controls; could frequently climb stairs, ramps, ladders, or scaffolds; and could continuously balance and kneel,

4

frequently crouch and crawl, but only occasionally stoop. (Tr. 285–88.) Dr. Kelly further opined that Jackson's "anxiety syndrome" left her unable to tolerate a noisy workplace, temperature extremes, or pulmonary irritants. (Tr. 289.) Dr. Kelly also wrote a "To Whom it May Concern" letter reflecting her opinion that, based on the examination on March 17, 2011, and Jackson's medical history, she will "have to be on light duty; limit lifting to 5 pounds and restrict pushing and pulling at work." (Tr. 362.)

On April 18, 2011, Jackson was again seen by Dr. Kelly, who noted that Jackson "presents today for fasting labs and paperwork to be filled out for restricted duties [at] work[,] [complains of] neck, shoulder and back pain." (Tr. 316.) Jackson also reported weakness and stiffness associated with her neck pain, as well as anxiety. (*Id.*) Dr. Kelly did not perform a physical examination on this date. She did issue another letter outlining Jackson's work restrictions, stating that, as a result of cervical spondylosis "which is osteoarthritis of the lower cervical spine . . . caus[ing] neck pain that radiates into the back of her head, shoulders and arms," Jackson would have life-long restrictions against "lifting, pushing or pulling anything more than 5 pounds." (Tr. 374.)

Jackson received mental health therapy from Victoria Cook, L.P.C., MHSP, during 2011 and 2012. On April 21, 2011, Ms. Cook wrote a letter in support of Jackson's need to modify her work schedule, stating as follows:

> Carolyn Jackson is receiving counseling and psychotropic drug therapy for major depression and panic disorder. Her condition is severe and chronic. I fear that if she continues to work a forty hour week it will result in a mental breakdown. Therefore, it is my recommendation that Ms. Jackson be limited to no more than twenty five hours of work weekly.

(Tr. 311.)

Jackson next saw Dr. Kelly on June 20, 2011, when she requested Dr. Kelly's signature on an application for a "disabled" license placard and expressed concern about fibromyalgia. (Tr. 318.) She also complained of mild abdominal pain and moderate left knee weakness, but stated that her arm and neck pain had improved since she changed her work conditions. (*Id.*) Dr. Kelly explained that Jackson was not qualified to receive a disabled license placard and advised Jackson to follow a low cholesterol diet due to bloodwork showing an elevated cholesterol level. (Tr. 318, 320–21.)

Jackson returned to Dr. Kelly for a yearly physical on August 12, 2011. (Tr. 325–26.) She did not report back or joint pain and Dr. Kelly noted normal musculature and the absence of any skeletal tenderness or joint deformity. (Tr. 325–26.) Jackson also reported no emotional disturbances, though Dr. Kelly noted that Jackson's affect was flat. (*Id.*) Dr. Kelly ordered routine bloodwork and referred Jackson for a colonoscopy due to guaiac positive stools. (*Id.*) Jackson did not return to Dr. Kelly until June 20, 2012, when she presented with a urinary tract infection and to follow up on the bloodwork that was done at her August 12, 2011 physical. (Tr. 380.) Dr. Kelly noted that Jackson's mood and affect were appropriate and advised her to quit smoking cigarettes and drinking alcohol. (Tr. 381.)

Jackson also received treatment after her alleged disability onset date from Dr. Roger A. Hodge, a primary care physician who began treating Jackson in September 2009. (Tr. 274.) On April 26, 2011, Dr. Hodge noted that Jackson was seeing a psychiatrist for depression with psychosis, wanted better anxiety medication, and was taking the narcotic Lortab as a maintenance medication for her chronic lower back pain. (Tr. 259–60.) He prescribed low-dose Buspar for anxiety and noted that Jackson did not display psychosis on that day. (Tr. 260.) Finally, Dr. Hodge stated that it was "[o]kay to continue maintenance dose of narcotic medication for chronic lumbar

6

degenerative disc pain," though he cautioned Jackson not to overuse the medication. (*Id.*) On

August 15, 2011, Dr. Hodge noted that Jackson displayed lumbar paraspinal tenderness and

suffered from a chronic pain syndrome. (Tr. 328.) He diagnosed bipolar disorder and tobacco use

disorder, but noted that Jackson was not interested in stopping smoking or seeing a psychiatrist.

(*Id.*) On February 15, 2012, Dr. Hodge refilled Jackson's prescriptions, but declined Jackson's

request to increase the dosage of her pain medication. (Tr. 391.) In August 2012, Dr. Hodge

referred Jackson to Dr. Cecelia G. Fisher, M.D., who diagnosed fibromyalgia and dysthymic

disorder. (Tr. 389.) When Jackson returned to Dr. Hodge, he noted that she still refused to see a

psychiatrist. (Tr. 387.)

On August 16, 2011, a DDS medical consultant opined that Jackson had no severe physical

impairment based on the records of treatment by Drs. Kelly and Hodge and Jackson's work and

daily activities. (Tr. 332–36.) That opinion was affirmed upon reconsideration by another DDS

consultant on January 10, 2012. (Tr. 370.)

On August 31, 2011, Jackson attended a consultative examination by senior psychological

examiner Bobbie L. Hand, M.S., whose report was endorsed by clinical psychologist Kathryn B.

Sherrod, Ph.D. (Tr. 337–43.) That report contains the following observations:

> Ms. Jackson arrived on time for her appointment, unaccompanied, saying that she
> drove herself to the office. She completed the background paperwork unassisted
> and returned it to the receptionist in a timely manner. While Ms. Jackson provided
> sufficient basic background information it should be noted that she also attempted
> to present herself as bizarre and seemed to be feigning psychological problems.
> For example, during the mental status examination, she enthusiastically stated, "I
> have imaginary friends," asking, "Do you want to see them?" When the examiner
> responded, "yes," Ms. Jackson reached into her bag and pulled out two stuffed
> monkeys, a stained glass type plastic figure of Santa Claus, and a coloring book
> that she opened to a page with a unicorn on it. She placed the items on the table and
> wrapped one of the monkey's arms around the other, saying "These are my
> imaginary friends." Ms. Jackson later commented, "Other people can't see them,"
> at which point, the examiner pointed out that she could indeed see the items because

7

Ms. Jackson had placed them on the table. At that point, Ms. Jackson grinned, appearing to be unable to contain her reaction, chuckling openly.

* * *

In a disability report-adult provided for review, Ms. Jackson responded "no" to the questions "Can you read and understand English?" and "Can you write more than your name in English?" During this evaluation, Ms. Jackson read and filled out five pages of background paperwork unassisted and, while her responses were not stellar, they were sufficient. She also appeared to have no difficulty understanding the examiner's questions during the interview or understanding instructions for testing tasks.

* * *

Ms. Jackson appeared to be attempting to present herself as bizarre and less functional than she actually is. Nonetheless, her eye contact was good, her affect was appropriate, and her speech was coherent and goal directed. She did not exhibit any symptoms of anxiety. She laughed and joked at times. She did not present with any true symptoms of psychosis. Ms. Jackson did not exert adequate effort on testing tasks and made blatant intentional errors at times. She readily comprehended test instructions, not requiring that any directions be explained in simpler terms. Her concentration appeared to be within normal limits. No limitation was observed with regard to her memory. To be more certain of how she was responding, Ms. Jackson was given the Lie and Frequency scales from the MMPI-2. She did not deny more common flaws than most people, indicating that she was not attempting to present herself in an unusually positive light. Ms. Jackson did claim too many unreasonable symptoms, indicating that she was exaggerating the severity of her psychological symptoms.

* * *

Ms. Jackson was also given the MMSE-2: EV, a 90-point standardized mental status exam. The MMSE-2: EV results in a T-score with a mean of 50 and a standard deviation of 5. On the MMSE-2: EV, Ms. Jackson received a T-score of 33, which converts to a standard score (with a mean of 100 and a standard deviation of 15) of 74, placing her performance in the borderline range; however, note that her scores are considered to underestimate her actual level of functioning as Ms. Jackson made blatant intentional errors on testing tasks. For example, when asked what type of building she was in, she enthusiastically responded, "It's the governor's office." She reported that the month was "October" when it was actually August. Also note that she knew the day of the month, which is significant in that people frequently do not know the day of the month even if they know what month it is. . . .

8

Ms. Jackson made three errors on the Bender Gestalt Test, indicating that her visual motor skills are within normal limits. She did not exhibit any tremor, indicating that her fine motor skills are adequate as well. She completed the drawings in five minutes and 36 seconds, which is about two minutes longer than most people take but it should be noted that she drew the first few figures without putting on her glasses. She seemed to work a little more quickly after putting on her glasses. Ms. Jackson drew the figures in the order in which they were presented to her, indicating that her organizational skills are adequate and providing evidence that she is not mentally retarded. Mentally retarded individuals do not usually possess adequate organizational skills . . . .

Despite her attempt at making herself appear out of touch with reality, she appeared to be in touch with reality. Ms. Jackson's eye contact was good, her affect was appropriate, her speech was coherent and goal directed, and she was polite. Ms. Jackson drove herself to this office unaccompanied and filled out the background paperwork unassisted. She is employed part time. As she was leaving the office, Ms. Jackson commented to the examiner, "Now I've got to go back to Saint Thomas and pick up my friend," explaining that she had "dropped someone off" prior to her evaluation, showing good organizational skills and good social skills. Ms. Jackson is given a diagnosis of Malingering. . . . She attempted to be manipulative during this evaluation. She appears to meet the criteria required for the diagnosis of Antisocial Personality Disorder.

(Tr. 337–38, 340–42.)

On September 21, 2011, a DDS psychological consultant opined that Jackson did not have a severe mental impairment, based largely on the results of this consultative examination. (Tr. 348–61.) That opinion was affirmed upon reconsideration by another DDS consultant on December 23, 2011. (Tr. 369.)

On February 16, 2012, Jackson presented to her therapist, Ms. Cook, complaining of depression and hallucinations. (Tr. 385.) Ms. Cook assisted Jackson in processing her current stressors and discussed with her the importance of separating hallucinations from reality. She diagnosed Jackson with schizoaffective disorder-bipolar type. (*Id.*) Ms. Cook saw Jackson again on March 1, 2012, when Jackson reported an increase in depressive symptoms over the past week. (Tr. 383.) She stated experiencing "thoughts that she would be better off dead" in the last few days,

9

but "denied having a plan or intent for suicide." (*Id.*) Ms. Cook reviewed with Jackson "cognitive/behavioral techniques for decreasing depression." (*Id.*)

Jackson continued to experience labile mood and auditory and visual hallucinations in an appointment with Ms. Cook on September 11, 2012. (Tr. 378.) Ms. Cook again discussed techniques for coping with these symptoms, and Jackson agreed to utilize the techniques. (*Id.*) On that same day, Ms. Cook completed a MSS in which she assessed Jackson as having extreme limitations in all areas of mental functioning and opined that these extreme limitations had been present for over ten years. (Tr. 375–77.) She explained that Jackson's bipolar-type schizoaffective disorder caused auditory and visual hallucinations and mood swings that severely limited her cognitive functioning, caused her to behave bizarrely, and lowered her tolerance for stress and ability to respond appropriately to change. (Tr. 375–76.)

## III. Analysis

### A. Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for

10

procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id.* at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

11

clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's

case under a five-step sequential evaluation process, described by the Sixth Circuit as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller*, 811 F.3d at 835 n.6; 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden

through step four of proving the existence and severity of the limitations her impairments cause

and the fact that she cannot perform past relevant work; however, at step five, the burden shifts to

the Commissioner to "identify a significant number of jobs in the economy that accommodate the

claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*,

652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five,

the ALJ must consider the combined effect of all the claimant's impairments, mental and physical,

exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn*

*v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The

agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-

Vocational Guidelines, also known as "the grids," but only if a nonexertional impairment does not

12

significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. Plaintiff's Statement of Errors

#### 1. Weighing of Dr. Kelly's Opinion Evidence

Jackson first argues that the ALJ erred in weighing of the opinions of her treating physician, Dr. Kelly, and treating therapist, Ms. Cook. With regard to Dr. Kelly, the opinions at issue are the MSS completed after her initial examination of Jackson on March 17, 2011 (Tr. 285–90), and the two letters written in quick succession following that examination concerning Jackson's restrictions on lifting, pushing, and pulling. (Tr. 362, 374.) The ALJ weighed these opinions as follows:

> The undersigned accords less than controlling weight to Dr. Suzette Kelly's opinions set forth in Exhibits 6F, 17F, and 22F. The treating physician's opinions are more a vocational opinion than a medical opinion and thus not entitled to great weight. The doctor's assessments were based primarily on the claimant's subjective symptoms, which, for reasons stated in detail above, are not reliable. Additionally, the doctor's assessments were devoid of any explanation, rationale, clinical findings, or reference to objective testing. Dr. Kelly's own treatment notes fail to document significant abnormalities on exam (Exhibits 1lF and 24F). The lack of substantial support from the other objective evidence of record renders the opinions less persuasive. Additionally, the claimant's ability to continue working 5 hours a day directly contradicts the limitations specified in Exhibit 6F.

13

(Tr. 20.) The ALJ further explained that, "[w]hile the undersigned does not give significant weight to the opinions of Dr. Kelly regarding the claimant's physical limitations in light of her continued ability to work part-time and her reported daily activities, these conditions were considered in limiting the amount she can sit, stand, walk, lift, carry, be exposed to hazards, and by giving her a sit/stand option." (Tr. 21.)

A treating physician's opinion is not entitled to controlling weight if it is not well supported by accepted clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record. "When deciding if a physician's opinion is consistent with the record [as a whole], the ALJ may consider evidence such as the claimant's credibility, whether or not the findings are supported by objective medical evidence, as well as the opinions of every other physician of record." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010). If the ALJ decides that the opinion does not merit controlling weight, she must decide what weight to afford it in light of factors including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)).

Here, Jackson argues that the ALJ failed to appropriately identify how much weight she gave Dr. Kelly's opinions because the ALJ stated only that Dr. Kelly's opinions were given "less than controlling weight," leaving it "unclear if they were given great weight, significant weight, little weight, or any weight at all." (Doc. No. 14-1, PageID# 443–44.) Jackson does not consider, however that the ALJ concludes her analysis by stating that Dr. Kelly's opinions were "not give[n] significant weight[.]" (Tr. 21.) That assessment is supported by the ALJ's findings that Dr. Kelly's

opinions were "devoid of any explanation, rationale, clinical findings, or reference to objective testing" and "lack . . . substantial support from the other objective evidence of record[, rendering] the opinions less persuasive." (Tr. 20.) However, the ALJ also states that she considered Dr. Kelly's opinions in determining limitations to Jackson's working conditions. (Tr. 21.) Thus, the Court can surmise that the ALJ afforded Dr. Kelly's opinions less than significant weight and more than no weight at all, a conclusion that is supported by the ALJ's assessment of Dr. Kelly's opinions in light of the record as a whole.

Jackson also takes issue with the ALJ's statement that Dr. Kelly rendered opinions that were more vocational than medical, arguing that the MSS form that Dr. Kelly completed is approved by the agency for use in providing medical opinions. But the ALJ's conclusion is not based on Dr. Kelly's use of the MSS form. Instead, it is based upon her finding that Dr. Kelly's conclusions were based on subjective reports, not clinical findings or testing, with little support from objective evidence in the record. The Court also notes that Dr. Kelly wrote two short opinion letters that are specific to Jackson's requests for accommodations at work and are directly vocational in nature. (Tr. 134–35, 362, 374.) Finally, regarding Dr. Kelly's opinions stated in the MSS, the ALJ properly found that the severe restrictions Dr. Kelly recommended, including an inability to sit, stand, and walk in combination for more than two-and-a-half hours, are not supported by treatment notes, medical evidence, or Jackson's demonstrated ability to work daily five-hour shifts at Goodwill.

Jackson also argues that there is no support for the ALJ's conclusion that Dr. Kelly's opinions were based primarily on her subjective symptoms, noting Dr. Kelly's reliance on an x-ray showing degenerative joint disease of the lumbar spine. (Tr. 285.) That x-ray, taken in May of 2009, shows mild degenerative changes (Tr. 267), and other films taken of Jackson's cervical

15

spine in May 2009 and June 2010 similarly show mild degeneration, albeit with "mild" or "small"

bone spurs encroaching upon the neural foramina at that spinal level. (Tr. 266, 280.) The DDS

medical consultant who reviewed Jackson's file in August 2011 did not find those x-rays to

establish severe spinal impairment. (Tr. 332–36.) The ALJ gave significant weight to the

consultant's opinion, but also considered Dr. Kelly's opinion in finding Jackson limited to light

exertion with a sit/stand option and no exposure to workplace hazards. (Tr. 21.) Substantial

evidence supports the ALJ's decision weighing of Dr. Kelly's opinion in reaching her final

determination.

### 2.    Weighing of Ms. Cook's Opinion Evidence

With regard to the opinions of Jackson's therapist, Ms. Cook, and the determination of

Jackson's mental RFC, the ALJ reasoned as follows:

> The undersigned notes that while Victoria Cook, LPC, a treating therapist, has made
> medical opinions regarding the claimant's functional limitations which are set forth
> in Exhibits 17F and 23F, a therapist is not considered an "acceptable medical
> source" as defined in 20 C.F.R. §§ 404.1514 and 416.913, and therefore her opinion
> is not accorded controlling weight. 20 C.F.R. 404.1527(d)(2), 416.927(d)(2), and
> Social Security Rulings 06-3p and 96-3p. (Exhibit 17F). Further, Ms. Cook's
> assessment is not supported by the objective evidence of record as her own
> treatment notes do not document any objective abnormalities. Her assessment is
> also contradicted by the findings of Ms. Hands's psychological evaluation that the
> claimant was attempting to feign psychological problems (Exhibit 15F). The
> undersigned gives no weight to her assessment set forth in Exhibit 23F that the
> claimant has marked limitations in functioning as it is contradicted by the
> claimant's ability to work 25 hours a week and her activities of daily living set forth
> above.
>
> . . .
>
> While it is determined that the claimant does not have any disabling mental
> impairments, the claimant's subjective complaints of a learning disorder and her
> limited ability to read/write were accounted for in limiting her to simple, repetitive
> work with no reading or writing performed as part of the regular job duties, and a
> preference for learning how to do a task by observation.  This residual functional
> capacity is based on the claimant's activities of daily living being inconsistent with
> disabling impairments and the findings of Ms. Hand's consultative examination.

16

(Tr. 20–21.)

Jackson points out that Ms. Cook assessed "extreme" limitations, not "marked" limitations, in every domain of Jackson's mental functioning and opined that these limitations were first present over ten years prior to her assessment. (Tr. 375–77.) Ms. Cook stated that, "[d]ue to experiencing auditory and visual hallucinations and experiencing periods of severe depression or mania, [Jackson's] cognitive functioning is severely impaired" and her "behavior is often bizarre, her tolerance for stress is low and she responds poorly to change." (Tr. 375–76.) Yet, Ms. Cook had previously recognized that Jackson's impairments would not prevent her from working twenty-five hours per week. (Tr. 311.) The ALJ's note of this inconsistency, coupled with the conviction of the consultative examiners after interviewing and testing Jackson that she was feigning her psychological symptoms, substantially supports the ALJ's determination and places it within her "broad discretion" in weighing the opinions of a source who is not a physician or psychologist. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

Jackson also cites a negative performance review from Goodwill (Tr. 129–33) as proof that she was not psychologically able to perform her part-time job in a manner acceptable to her employer and faults the ALJ for failing to consider this review in determining Jackson's mental RFC. However, the overall conclusion of the performance review was that Jackson was an "effective" employee (Tr. 132), and the fact remains that she had performed satisfactorily in both full- and part-time capacities with Goodwill since 2007. (Tr. 126.) The Court finds no error in the ALJ's weighing of Ms. Cook's opinions or her determination of Jackson's mental RFC.

### 3. Findings at The Step Two Severity Determination

Jackson argues that the ALJ erred in failing to address the severity or nonseverity of each of her diagnosed impairments. But the regulations do not require that all diagnosed impairments

17

be scrutinized for their severity. Indeed, even an erroneous finding of impairment nonseverity is not reversible error, so long as at least one severe impairment is identified and the sequential evaluation continues. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Ultimately, a claimant's RFC is determined based upon the combined effects of all medically determinable impairments, severe and nonsevere alike. The fact that some of Jackson's diagnosed impairments were not mentioned at the step two severity determination is thus "legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz*, 837 F.2d at 244). Further, the effects of Jackson's nonsevere mental impairments were considered in determining an RFC that includes mental and physical limitations, and the conditions that informed Dr. Kelly's MSS were explicitly accounted for as the basis for her physical limitations. (Tr. 21.) Accordingly, the Court finds no merit in this argument.

### 4. Failure to Include a Function-By-Function Assessment

Next, Jackson argues that the ALJ erred in failing to include an explicit function-by-function assessment of the seven strength demands (sitting, standing, walking, lifting, carrying, pushing, and pulling) in her RFC determination, as required by Social Security Ruling (SSR) 96-8p. The Sixth Circuit has addressed this argument as follows:

> In *Bencivengo [v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00-1995 (3d Cir. Dec. 19, 2000)]*, the Third Circuit stated, "Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing." *Bencivengo,* slip op. at 4. The Third Circuit distinguished between what an ALJ must consider and what an ALJ must discuss in a written opinion. The ALJ need not decide or discuss uncontested issues, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Bencivengo,* slip op. at 5.

*Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547–48 (6th Cir. 2002). Here, the ALJ addressed Jackson's exertional and nonexertional capabilities, citing the evidence that supports her

conclusions. Jackson argues that the ALJ should have addressed her ability to push and pull, because Dr. Kelly specifically and consistently assigned restrictions against pushing and pulling. However, as discussed above, the ALJ properly determined that Dr. Kelly's opinions were not entitled to significant weight. The ALJ also properly relied on Jackson's admitted ability to perform household chores without assistance, including vacuuming, sweeping, taking out small bags of garbage, and doing small loads of laundry. (Tr. 340.) The Court finds that the ALJ's RFC determination evidenced her sufficient consideration of Jackson's functional abilities and complied with SSR 96-8p.

### 5.    Reliance on Global Assessment of Functioning (GAF) Score

Finally, Jackson argues that the ALJ erred in "decreas[ing] the severity of the claimant's mental impairments based on a GAF score of 65 which . . . indicates 'some mild symptoms,'" because GAF scores do not correlate well with the evaluation of mental disability and Jackson had also been assessed the much lower score of 35. (Doc. No. 14-1, PageID# 452–53.) "GAF scores are not a reasonable replacement for the more particularized data available in actual treatment notes or reports of examination results, but instead are largely superficial descriptors representing 'a clinician's subjective rating of an individual's overall psychological functioning' in terms 'understandable by a lay person.'" *Gentry v. Soc. Sec. Admn.*, No. 3:12-1139, 2015 WL 4276238, at *6 n.4 (M.D. Tenn. July 14, 2015) (quoting *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007)), *report and recommendation adopted sub nom. Gentry v. Colvin*, No. 3:12-CV-01139, 2015 WL 5052818 (M.D. Tenn. Aug. 26, 2015). Here, the ALJ noted the score of 65 as one of several examples of clinical findings that were not of the type "one would expect if the claimant were disabled." (Tr. 19.) Elsewhere, the ALJ relied heavily upon the clinical observations and data as the basis for finding her finding of only mild mental limitations.  Because the ALJ determined

19

Jackson's mental RFC by relying primarily upon these other sources (Tr. 19–20, 21), the Court finds no error in the ALJ's passing reference to the GAF score.

## IV.     Conclusion

In light of the foregoing, the Magistrate Judge RECOMMENDS that Jackson's Motion for Judgment on the Administrative Record (Doc. No. 14) be DENIED and the decision of the Commissioner be AFFIRMED.

Any party has fourteen (14) days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days after being served with a copy thereof in which to file any responses to said objections.  Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

ENTERED this 5th day of January, 2018.

_____
Alistair E. Newbern
U.S. Magistrate Judge